# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

## JOHN ZEIGLER and SAMUEL ZEIGLER, Executors of Dr. CONRAD ECKERT, v. JOHN ECKERT.(a)

The law presumes that every legacy is intended to be a clear gratuity; but this presumption, like every other, may be rebutted by parol proof; and, for that reason, a legacy to the testator's debtor is not *per se* a discharge of the debt. But as the presumption may be removed by extrinsic evidence, so may it be restored; and the testator's declarations before, at, and after, the making of the will, that he did not intend the debt should be demanded, constitute a defence to an action for it by the executor.

ERROR to the Common Pleas of Cumberland county.

This was a judgment for $1000, entered upon a bond and warrant of attorney to August Term, 1840. There were also six other judgments on similar bonds, to the same term. There was also another between the same parties, of the same term, for $2000. All these judgments were opened, and the defendant let into a defence upon the plea of payment with leave.

This was the trial of the issue in the first case, and the parties agreed that all the other cases except the last should abide the event of this.

The plaintiffs gave in evidence the seven bonds of John Eckert, to Conrad Eckert, dated the 16th April, 1836, conditioned for the

---

(a) This case was accidentally omitted in the reports of May Term, 1843. A report of it, however, appeared in the Pennsylvania Law Journal for August, 1847. To that valuable journal, the reporter acknowledges his indebtedness for this report.

payment of $1000, on the 1st of April, 1837–'38–'39–'40–'41–'42 and '43. The payment of one year's interest on the first bond, was endorsed upon it on the 27th June, 1839, for which John gave Conrad a note.

The defence was, that Dr. Eckert's will, and the facts and circumstances which occurred before, at the time, and after the making of it, amounted to a release; to maintain which, the defendant gave in evidence the will, in which the testator bequeathed to John Eckert, the defendant, the following legacy: "I also give and bequeath to John *Ackert*, *neffay*, the sum of one thousand dollars."

The defendant then offered to prove, that the bonds in suit were given for a tract of land; that when the will was being drawn, the testator requested the scrivener to get these bonds and destroy them, as he did not intend they should ever be collected; that the scrivener would find them in a chest in the room where they were deposited; that after the will was drawn and executed, he again said to the scrivener not to forget what he had told him to do; that from the time the will was written until his death, the testator was unable to leave his bed; and that he died a few hours after he executed his will. To be followed with corroborative declarations both before and after the making of the will, that he never intended these bonds to be collected, but that John was to have the land clear and the thousand dollars besides.

The plaintiffs objected on the following grounds:—

1. That extrinsic evidence is not admissible to change the bequests, or to affect the validity of the bonds.

2. That declarations of the testator at any other time than that of making the will, are not competent.

The court overruled the objections, and sealed a bill of exceptions.

Thomas McDonald, the scrivener, testified:—When Dr. Eckert called on me to write his will, I told him I would do what I could for him. The will was written on 26th May, 1840, but not executed until 27th. In writing the will, he first bequeathed a house and two lots he owned in town to Mrs. Sturm. To Mrs. Dunbar he bequeathed a house and lot—to Mrs. Sentman $1000. Then he came to John, [defendant.] He studied awhile, and said he did not give John Eckert quite so much as the others, or to that amount—that he had a $2000 bond that he intended to make a present to him, or rather he said *bonds* in his way of talk. I then proceeded on and wrote that far in the will, and then asked him if I should mention in the will the $2000 to John. He said no, but

I should insert the $1000 and leave the bond out. He said *bonds*—can't say particularly an instance whether he said *bonds* or *bond*. He then said that the *bonds were in the chest, and they might easily be got and put out of the way.* Then I told him, perhaps, Doctor, you had better wait till to-morrow, perhaps you will be better able. He looked pretty well that day. I was not willing to go to the chest to take out the bonds. There were persons coming in and out, and I thought some person might come in, and think I was making too free, and that I might create some excitement among them by my going to his papers. He then said perhaps he would be better, that he then felt tolerably well. Then I went on and finished out the remaining part of John's bequeath. About the time I finished John's bequeath, he was very anxious and did not want anybody to know it. Some one came in, he ordered me to slip the will under the quilt and go down stairs. When I came up stairs again, he again mentioned the $2000 *bond* or *bonds.* He said he should do something with them. I then told him better he should wait till next day. He allowed then we should put it off—put off getting the *bonds.* He then told me he had bought the mill property for John, or rather talked it over about John—said he had bought the property for John, and John could make a very handsome living on the property if he would take care. He said if John would mind his business he never intended to charge him for the property. I then went on from that and finished the will according to his directions. Then I took the will with me into my end of the house—we both lived under one roof. I was then not in to see him till dark the same day. I then went up to see him. I stayed some time with him and left him. Nothing said then about the will or *bonds.* Between four and five o'clock the next morning I was called for and went to him. He said he felt very bad, and that the will should be finished. I then asked who he was going to appoint executors, &c. We then left the room. I did not go up to his room again till toward noon. He then seemed to want to say something to me; I went close to him; he spoke very low. He then said that you know what I said about *those bonds.* That was the last I spoke to him and the last I think he did speak—that was, "you know what *I said about those bonds.*" The day before he had spoke to me about getting the *bonds out of the chest, for the purpose of having them destroyed.*

The testator and I frequently talked about those *bonds* of John Eckert—he said he had bought the property for John Eckert, and that he held a $2000 bond against him that he intended to give to

him. This conversation took place perhaps three or four weeks before he took sick, or may be not so long. He said if John Eckert would mind his business, and had that property clear, he could make a very good living. He said, for his part, he never intended to ask John for any money—that he had bought the property particularly for John—that he had been a very good boy as long as he was with him. I think that at the same time he told me, that he thought it no more than right he should help John to get a home.

The reason he assigned for taking *those bonds* was, that John might be afraid of his pushing him for them, and it would push him on; that he would think he would have to pay the bonds one day or other, and it would urge him on that he would not fall behindhand.

Adam A. Humbrich testified:—I had a conversation with Conrad Eckert a few days after his last illness; he spoke of John and the property he had bought of him. The doctor said he would make a man of John; that he should have the property he had bought of him, clear of all encumbrances. That the day of or the day before his death, Dr. Eckert again said that John should have the property clear of all encumbrances, and $1000. That in case he got into difficulties, he should have something to assist him. He said in German, John's papers should never come to light; that he had told McDonald (the scrivener) what he should do with the papers. The doctor told me, previous to moving into the house in which he died, that the mill property should be for John.

John Cornman testified:—I had two conversations with Dr. Eckert about John Eckert's affairs. He said he had bonds against John to the amount of $7000, that he did not calculate John to pay principal or interest, and that he thought it hard to pay tax for money which he never calculated to collect. I asked him why he held these bonds if he did not intend to collect them; he said he held them, that 'if John did not do as well as he ought to do, he would have the first chance of recovering the property; that others could not come in and take it from him. I told him it was wrong to hold these bonds if he did not intend John to pay them; that he might be called off suddenly some day, and this might operate seriously against John. He said he would take care that no one would be able to collect these bonds from John after his death.

In the second conversation, he again mentioned about the mill property he had given to John, and one thing and another relating to it. He said John should have the mill property clear, and

should have as much property from him as would put every thing in good order, and that he thought John could do without any thing more. I think this was about three weeks before his death. In all conversations with Conrad, John appeared to be a favourite child.

Francis Noble testified:—First week in May, the month Dr. Eckert died, he had been in town. He came past where I lived quite exhausted; he sat down alongside of me and placed his hand on me, and said he wished he had taken my advice, he had caught such a cold, it was killing him. I told him it was great folly for a man to abuse himself by hard labour that had so much to live on as he had; and to give it to unthankful people. He said then he intended to give his property to those who would not be unthankful; he said he had bought a mill and sold it to his nephew John, merely a form, he meant to give it to him. He said he had an only sister that lived in Lebanon county, that her brothers had defrauded her out of her father's estate, that he meant to leave her next to John, and Mrs. Senseman next. The next of his heirs he would leave small portions to, and the rest to be divided agreeably to the portions they would receive. Shortly after this he died. Some conversation took place the day before; just the same. He said John was a very good boy.

Jesse Zeigler testified:—At the time John bought the mill property, the doctor and I had a conversation. I told him he charged him too much for the property. He said he might as well charge much as little, he would get it any how—if he charged him high John would may be try and work through; that he had bought it for him and he should have it. He always spoke well of John.

The plaintiffs requested the court to charge the jury upon the following points:

1. That the evidence given of the declarations of the testator, Conrad Eckert, made to the several persons mentioned by the witnesses, in the absence of John Eckert, and without his knowledge, cannot operate in law as a release of the debts which are the subject-matter of these suits.

2. That if the jury believe all the evidence, it is not such as will in law justify verdicts for the defendant.

To which the court said: The first point is answered in the affirmative. It is only through the instrumentality of the will that the defendant can claim to be exonerated from payment of these bonds. Had no will been made, defendant would not be exonerated from the payment of these bonds, from any thing that appears.

There is nothing shown that would amount to a release, according to the legal acceptation of that term.

To the second point they made answer, substantially, by instructing the jury that if they found from the evidence that the testator intended to give the defendant the legacy bequeathed to him in the will, over and above the bonds, and that he should be exonerated from the payment of the bonds, they should find for the defendant.

The jury found for the defendant, and plaintiffs assigned the following errors :

1. The court erred in overruling the plaintiffs' objection to the evidence as contained in the first bill of exceptions.

2. The court erred in their answer to the plaintiffs' first point.

3. In answer to plaintiffs' second point.

4. The whole charge of the court as to the law of the case was erroneous.

*Graham* and *Watts*, for plaintiffs.

*Gallagher* and *Biddle*, for defendant.

Gibson, C. J.—I view this controversy, belonging as it does to equity, as if it stood on a bill for the legacy; and the question is, how would a chancellor treat it? It is certain he would not admit parol evidence to control the will. Such is the principle of Tufnel *v.* Constable, 8 Simon, 69 ; and Doyle *v.* Blake, 2 Scho. & Lef. 240. Nor to raise, but only to rebut an equity; and such was the rule in Fordyce *v.* Willes, 3 Br. C. C. 377; Freemantle *v.* Banks, 5 Ves. 79; and Monck *v.* Lord Monck, 1 Ball & Beatty, 298. But it certainly may be used by an executor, provided for by a legacy, to rebut the equity of the next of kin; or by the next of kin, to repel the rebutting evidence of the executor. A list of authorities for this, which it would be tedious to repeat, is to be found in the notes to Stephenson *v.* Heathcote, 1 Eden's Rep. 40, 41. In like manner, parol evidence was received in Monck *v.* Lord Monck, to fortify a presumption of ademption. For these purposes, it is settled that parol evidence of the testator's declarations, before, at, and after the publication of the will, is competent; and how stands the case on this record? We are on a plea to an action on a bond, it is true; but if the debt has been equitably discharged, a chancellor would enjoin the executors as readily as he would decree against them on a bill for the legacy. Indeed the case of Aston *v.* Pye, 5 Ves. 350, in note, was an action at law on a note endorsed, "Henry Pye pays no interest, nor shall I even take th

principal unless greatly distressed;" and this endorsement, though not a testamentary act, was held by the Common Pleas, to which the case had been sent by the Master of the Rolls for a trial at law, to be a discharge. In Byrne *v.* Godfrey, 4 Ves. 9, Lord Loughborough expressed something like dissatisfaction at the decision of that case; but in Eden *v.* Smith, 5 Ves. 354, he expressed his concurrence. But to say no more of the question at law, what would be the defence to a bill in the present case? The legacy, purporting to be a benefit to the legatee, would be demandable in the first instance; and to encounter it, the executors would be driven to the bonds, which would not, *prima facie*, appear to be discharged by the will. But the presumption that no release was intended when a debt stands against a legacy, may, like any other presumption, be rebutted by proof arising either on the face of the will, or dehors. It is not adduced to control the will, but to rebut a presumption from matter extrinsic to it; and its competency to do so is established, not only by the cases I have quoted for the general principle, but particularly by Eden *v.* Smith, to which I have referred for Lord Loughborough's opinion of Aston *v.* Pye; and which, if it be law, rules the very point before us. A father, who had taken two bonds from his daughter's husband, for money lent, said in a letter to the husband's mother, that the debt was forgiven, and expressed the same thing to others, whose testimony was corroborated by cash accounts in the testator's handwriting; and the chancellor decreed, not only payment of the legacy, but that the other bond should not be demanded. I am aware that the propriety of the decision was doubted by Lord Eldon in Pole *v.* Somers, 6 Ves. 322, but he did not venture to say it was not law. Notwithstanding the weight of that great man's name, I am unable to entertain a similar doubt. What was the object of the extrinsic evidence, but to rebut a presumption in the interpretation of a will; and that it is competent to do so, is an elementary principle guarded from abuse by the consideration that the court never decrees on the basis of it when the fact is at all in doubt. The sum of the matter is, that, though a parol discharge without consideration is bad, a testamentary discharge without it, is good: that the legal presumption of an intention not to discharge a debt which arises from a naked legacy to the debtor, may be rebutted by extrinsic proof; and that the presumption being first rebutted by it, the will, and not the proof, operates the discharge. The distinction may be a subtle one, but on it only can the preceding decisions be sustained; and they are too numerous to be overturned.

Now it appears in the proofs before us, that the testator, having no issue, received the defendant John, his nephew, into his house as an adopted child at the death of his father; and that he raised him from early infancy to manhood, entertaining for him the affection of a father. To one person he said, that he meant to leave his property to those who would not be unthankful for it, and that he had bought a mill and sold it to John for form's sake: to another, that he might as well charge much as little for it, as John would get it any how; and if he charged him high, John would try to work through. To another he said, that he would make a man of John; and that he should have the property clear, with 1000 dollars—the amount of the legacy subsequently given. Remonstrating with the county commissioners against the amount of tax assessed on his securities, he said that he did not look to payment of John's bonds, as he held them only to get the property back, if John should not do well; but that he would take care that no one should collect them after his death. To carry out his purpose, he instructed the person who wrote his will, to insert in it a legacy of 1000 dollars to John, saying that the bonds were in his chest, and could be easily got at and put out of the way. This person testified that, being unwilling to go to the chest, as persons were frequently passing through the room, who might think he was taking an improper liberty, he advised the testator to wait till the next day; and that he consented to do so, but again mentioned the bonds, and said the witness should do something with them. The will was executed the next morning; at noon he whispered to the witness: "You know what I said about the bonds,"—and died. Surely if ever there was a case of disappointed intention made clear by extrinsic evidence, this is one. The testator did every thing in his power to annul these bonds, and died in a confident belief that he had done enough. The case is decisively stronger than Eden v. Smith; and the urgency of it indicates its principle. Every allowance is to be made, in this as in every other respect, for the ignorance and helplessness of men in the article of death. The presumption that John's legacy was intended to be a clear gratuity, which was repelled in the first instance by the production of his bonds, was restored by the parol proofs of an intention to release them which had been frustrated by accident, which is a distinct head of equitable relief. The will then becomes a release; and it was shown that the executors ought not to recover.          Judgment affirmed.